**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5518-16T3
                A-5519-16T3
                A-5520-16T3
                A-0029-17T3

WILLIAM T. BYRNE,

       Petitioner-Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR, and
MONMOUTH UNIVERSITY,

       Respondents-Respondents.

_____

Argued November 26, 2018 – Decided December 21, 2018

Before Judges Gooden Brown and Rose.

On appeal from the Board of Review, Department of Labor, Docket Nos. 71,795, 71,796, 71,797, and 71,799.

William T. Byrne, appellant, argued the cause pro se.

Shareef M. Omar, Deputy Attorney General, argued the cause for respondent Board of Review in A-5518-16 (Gurbir S. Grewal, Attorney General, attorney; Melissa

Dutton Schaffer, Assistant Attorney General, of counsel; Aimee Blenner, Deputy Attorney General, on the brief).

Shareef M. Omar, Deputy Attorney General, argued the cause for respondent, Board of Review in A-5519-16 (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Shareef M. Omar, Deputy Attorney General, on the brief).

Shareef M. Omar, Deputy Attorney General, argued the cause for respondent Board of Review in A-5520-16 (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Jana R. DiCosmo, Deputy Attorney General, on the brief).

Shareef M. Omar, Deputy Attorney General, argued the cause for respondent Board of Review in A-0029-17 (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Christopher W. Weber, Deputy Attorney General, on the brief).

Respondent Monmouth University has not filed a brief.

PER CURIAM

In these back-to-back appeals, which we consolidate for the purpose of issuing a single opinion, William T. Byrne appeals from four adverse decisions of the Board of Review (Board) in connection with his applications for unemployment compensation benefits. In A-5518-16, A-5519-16, and A-5520-16, Byrne appeals the Board's June 30, 2017 final decisions, affirming the

decisions of the Appeal Tribunal to deny him unemployment compensation benefits, order restitution of benefits paid in the amounts of $33,288, $3000, and $992, respectively, impose fines totaling twenty-five percent of benefits paid, and disqualify him from receiving benefits for a period of one year beginning September 10, 2015. In A-0029-17, Byrne appeals the Board's July 17, 2017 final decision, substantially affirming the decision of the Appeal Tribunal to hold him liable to refund $2808 in benefits paid, impose a fine totaling twenty-five percent of benefits paid, and disqualify him from receiving benefits for one year, beginning September 10, 2015. Having considered the arguments and applicable law, we affirm.

We glean the following facts from the record. Since 1998, Byrne has been employed as a college instructor at Monmouth University (Monmouth), teaching computer science both in the classroom setting and online. Monmouth compensated Byrne on a bi-weekly basis through direct deposits into his bank account. On December 20, 2009, Byrne filed a claim for unemployment benefits and received benefits totaling $33,288 for the weeks ending January 23 through May 8, 2010; May 29 through August 14, 2010; September 4 through December 18, 2010; March 5 through May 7, 2011; May 28, 2011; June 4, 2011; July 9, 2011; July 23 through August 6, 2011; and September 3 through November 12,

2011. On December 19, 2010, Byrne filed a second claim and collected benefits totaling $3000 for the weeks ending January 8 through February 26, 2011. Byrne filed a third claim for benefits on August 19, 2012, and collected $2808 in benefits for the weeks ending September 8, 2012; January 19 through 26, 2013; and June 1 through 8, 2013. On August 18, 2013, Byrne filed a fourth claim for benefits and received $992 in benefits for the weeks ending September 7 and 14, 2013.

In 2011, a claims examiner forwarded Byrne's case to a Division of Unemployment Insurance (Division) investigator, who eventually conducted an audit and cross-matched all of Byrne's unemployment claims against the quarterly wages reported by Monmouth during the same time period. Upon detecting a "wage benefit conflict" during the course of the investigation, on September 14, 2015, the Division Director mailed four separate Determination and Demand for Refund notices to Byrne, advising him that he was ineligible for unemployment benefits because he was "employed by Monmouth University[,]" and obtained benefits "through false or fraudulent misrepresentation."[1] As a result, according to the Director, Byrne was required

---

[1] A fifth letter was mailed to Byrne by the Director on the same date, requesting a refund of $106 in overpayments for the week ending June 29, 2013, based on a finding that Byrne was ineligible for unemployment benefits because he had

to return "[a]ny money collected improperly . . . regardless of the reason for the overpayment," in accordance with N.J.S.A. 43:21-16(d); "disqualified for benefits for a period of one year" beginning September 10, 2015, in accordance with N.J.S.A. 43:21-5(g)(1); and fined twenty-five percent of the total benefits received, in accordance with N.J.S.A. 43:21-16(a)(1).

Byrne appealed the Director's determinations to the Appeal Tribunal on September 21, 2015, and a telephonic hearing on all four claims was conducted on January 13, 2016,[2] during which the assigned Division investigator and Byrne testified. The investigator testified that "[a] fraudulent determination was made based on the [fact that] [Byrne] did not report any earnings for [fifty-one] weeks and underreported [his earnings] for [thirty-five] weeks[.]" She explained that in reaching this determination, the Division "matched up" the Monmouth "payroll ending date[s]" to the weeks "in [Byrne's] unemployment claims" and discovered that Byrne's reported earnings conflicted with Monmouth's payroll records. In support, the investigator submitted numerous documentary exhibits,

---

"earnings which adjusted [his] weekly benefit rate." However, that decision is not part of this appeal.

[2] Prior to scheduling the telephonic hearing, on October 21, 2015, at the Director's request, the Tribunal remanded the matter for a possible redetermination. When a redetermination was not forthcoming, the matter was reopened on December 18, 2015.

including Monmouth's payroll records obtained from Monmouth's Manager of Payroll Services. The investigator explained further that when a claimant certifies for benefits, "the claimant is asked seven questions[,] . . . the last one being 'Did you work during the weeks claimed?'" According to the investigator, if "you answer yes to that question[,] . . . then you put in your hours worked and your . . . gross earnings[,]" regardless of whether you are working part-time or full-time.

When questioned about the origin of the investigation, the investigator explained that a claims examiner sent a notice dated January 11, 2011, indicating "there might be an overpayment in the system" based on an application for unemployment benefits submitted by Byrne. The claims examiner noted that although "[Byrne] worked for Monmouth University during the . . . fourth quarter[] [of] 2009, [and the] first and second quarters of 2010[,] . . . no earnings [were] reported." The investigator testified that although the inquiry was initiated in 2011, there was no final decision made until 2015. She attributed the delay to the fact that "[d]uring that time[,] . . . only . . . two investigators [were] auditing unemployment claims" and "because the unemployment [rate] was so high[,] [t]here was a backlog."

The investigator explained further that after the investigation commenced and the possible "wage benefit conflict" was discovered, "[f]act [f]inding letters were mailed out on May 29, 2015 to [Byrne's] address of record[,]" and he was "given ten days to respond." When Byrne did not respond by the deadline, the Determination and Demand for Refund notices were generated. According to the investigator, Byrne did ultimately respond to the fact-finding letters after the deadline, essentially explaining that he reported his earnings based on when he worked, rather than when he was paid. Although Byrne's untimely response was not considered prior to the issuance of the Director's notices, the investigator testified that the outcome would not have been different because, in addition to the periods of underreporting, Byrne reported "no earnings" for periods when Monmouth's payroll records showed otherwise.

During his testimony, Byrne admitted working at Monmouth while receiving unemployment benefits, but believed that he was entitled to benefits because he worked "part-time" and his work days and work hours varied. He did not dispute the earnings reported in the Monmouth payroll records and admitted receiving an unemployment benefits "blue book" instructing him to "report all gross earnings and all hours worked." He also admitted that despite "getting paid on a bi-weekly [basis], . . . any week when [he] did not do any

work[,] when [he] logged into the system [and] it [said], 'did you work this week?' [he] would answer no." Consistent with his prior response to the Director's fact-finding letters, Byrne explained, however, that generally, the conflicts in his reporting occurred because he reported his earnings when he did the work rather than when he was paid. He also claimed that he was compensated by Monmouth for services performed in "previous years," but was unable to provide proof that his reported earnings were for work performed earlier, rather than during the relevant time period.

In specifically explaining his failure to report his earnings in 2010, Byrne stated:

> [C]lasses that are taught online [have] many, many weeks where [there is] no work for me to do. There is work for me to do at the end of the semester when I[] [am] gathering all the data and . . . calculating the students' grade[s] and then answering emails that students have . . . . So, when I . . . originally . . . opened my claim[,] I went to the Neptune, New Jersey office and I explained the situation and I wanted to know how to report my income, and they said to me if there[] [is] any week where you do not work . . . you do[] [not] report income . . . .

Regarding his underreporting of earnings for designated weeks in 2011, 2012, and 2013, Byrne explained that "from 2011 onward . . . most weeks [he] reported about [eighty percent] of what [he] was paid because [he] was doing about

[eighty percent] of the work" for which he was being paid. "[T]hen in the . . . week of finals, [he] would do a lot more work and reported more income."

Byrne stated that during "the weeks when the semester ended[,] which would be . . . the middle of May . . . , the middle of August . . . , and . . . right before Christmas[,]" if he had income that was "higher than whatever the maximum amount unemployment allow[ed,] . . . the system [would not] take [the number]." Therefore, according to Byrne, "[he] went down to the office in Neptune for them to add it" and "[he] did this three times throughout the year." Although he did not bring his payroll records to show his earnings, Byrne claimed that each time, the Neptune office staff "either . . . entered the maximum amount . . . or . . . left that week unclaimed." Byrne attributed the weeks throughout the year where there was no income reported to these instances when the system would not accept such a high number.

Byrne "agree[d] that this . . . [was] very odd that somebody could have a part-time job that require[d] them to almost always do no work and then do a lot of work at once[,]" and "[t]hat's why [he] went down to the office in Neptune and explained the situation." He stated further that the Division's exhibits omitted the weeks when the amount he reported was more than the amount reflected in Monmouth's payroll records. Byrne also testified that he had a

similar hearing in January 2011 during which he provided the same explanation and was told by the examiner "that there was no refund needed but going forward [he] needed to report income." As a result, according to Byrne, "from 2011 onward, [he] always reported the number of hours that [he] worked and then divided by what [he] got paid for the semester." When asked by the examiner whether he received a determination as a result of the 2011 hearing, Byrne responded that his claim "was deemed not extendable."

Following the hearing, on January 15, 2016, the Tribunal mailed its decisions in all four cases to Byrne and Monmouth, affirming the Director's determinations. The Tribunal rejected Byrne's "contention that he often times received compensation from [Monmouth] for services performed in previous years" because "there [was] no proof to support the [contention]." The Tribunal also found Byrne's contention that "he did not declare his earnings" because "he did not always perform work during the weeks in question[]" to be "without merit as the fact remain[ed] he was still considered 'employed' and justly compensated as his employer payroll records . . . indicate[d]." Furthermore, according to the Tribunal, "there were several weeks [Byrne] reported 'zero' earnings" and "even after" being admonished in January 2011, still reported "well below what he actually earned." The Tribunal concluded that Byrne's

"failure to disclose his correct earnings" and "knowingly misrepresent[ing] himself as unemployed during the period under review[,]" was "a fraudulent representation" that subjected him to "disqualification and reduction in benefits" under N.J.S.A. 43:21-5(g)(1) for one year from September 10, 2015, liability for a refund of the benefits received pursuant to N.J.S.A. 43:21-16(d), and an imposition of a fine totaling twenty-five percent of the benefits received in accordance with N.J.S.A. 43:21-16(a)(1).

Thereafter, Byrne appealed the Tribunal's decisions to the Board. On June 30, 2017,[3] the Board substantially affirmed and adopted the decisions "for the reasons set forth therein, except that the . . . decision[s] inadvertently omitted [the] week ending June 4, 2011[,] and included [the] week ending July 16, 2011[,]" omitted the week ending January 12, 2013, and included the week ending January 26, 2013. Other than those modifications, the Board affirmed the Tribunal's determinations, holding Byrne liable to refund benefits paid,

---

[3] According to Byrne, because neither he nor Monmouth received the Tribunal's January 15, 2016 decisions, the Tribunal "resubmit[ted]" one decision on July 6, 2016, and "resubmit[ted]" the other three decisions on July 21, 2016. Thus, when Byrne filed his appeal on July 26, 2016, the Board dismissed the appeal as untimely based on the January 15, 2016 decision dates. After Byrne appealed the dismissal to this court, the Board moved for a remand, which was granted. On June 30, 2017, the Board reopened Byrne's case, setting aside its earlier dismissals.

A-5518-16T3

imposing a twenty-five percent fine, and disqualifying him from unemployment benefits for a period of one year.[4]  This appeal followed.

On appeal, Byrne argues that the Board erred by affirming the Tribunal's findings that he fraudulently reported his gross earnings without properly considering his explanation that he reported his earnings based on the amount of work performed each week, rather than the amount of pay received, in accordance with the Division's reporting rules and the advice of agency staff. He argues further that because he was entitled to partial unemployment benefits, he should only be required to refund the difference between the amount received and the amount he was entitled to receive if he had accurately reported his earnings.  Finally, he contends that the demand for a refund of $33,288 in connection with his first claim is barred under the doctrine of res judicata because it was previously adjudicated in 2011.

Our scope of review of an administrative agency's decision is limited. Brady v. Bd. of Review, 152 N.J. 197, 210 (1997).  Deference is afforded to the agency's fact-findings if reasonably based on the proofs.  Ibid.  "[I]n reviewing

---

[4]  We note that neither the Tribunal nor the Board relied on N.J.S.A. 43:21-4(g), disqualifying employees of educational institutions from payment of unemployment during designated periods, to find Byrne ineligible to collect unemployment benefits.

A-5518-16T3

the factual findings made in an unemployment compensation proceeding, the test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Ibid. (quoting Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985)). Although we are not bound by the agency's interpretation of the law, Utley v. Bd. of Review, Dep't of Labor, 194 N.J. 534, 551 (2008), we also accord particular deference to the expertise of the Board of Review and its repeated construction and application of its governing statutes. See, e.g., Brady, 152 N.J. at 210. Thus, we will not disturb or reverse the agency's decision unless it was "arbitrary, capricious or unreasonable, or . . . [un]supported by substantial credible evidence . . . ." Bailey v. Bd. of Review, 339 N.J. Super. 29, 33 (App. Div. 2001).

While a part-time worker may be eligible to collect unemployment compensation under certain circumstances, Goodman v. Bd. of Review, Dep't of Labor & Indus., 245 N.J. Super. 551, 556-57 (App. Div. 1991) (citing N.J.S.A. 43:21-19(m)), eligibility to receive benefits for any week is contingent upon, among other things, the eligible claimant "satisf[ying] the reporting requirements prescribed by the Division, one of which is that he accurately report all wages earned during the period involved." Malady v. Bd. of Review,

13

159 N.J. Super. 530, 532 (App. Div. 1977), rev'd on other grounds, 76 N.J. 527 (1978); see also N.J.A.C. 12:17-6.3(a).  "N.J.S.A. 43:21-16(d) provides that whenever 'any conditions for the receipt of benefits imposed by this chapter' are not fulfilled, the Division may direct a claimant to repay 'a sum equal to the amount so received by him.'"  Ibid.  "Claimants bear the burden of proof to establish their right to unemployment benefits."  Brady, 152 N.J. at 218.

Additionally, "N.J.S.A. 43:21-16(d) requires the full repayment of unemployment benefits received by an individual who, for any reason, regardless of good faith, was not actually entitled to those benefits."  Bannan v. Bd. of Review, 299 N.J. Super. 671, 674 (App. Div. 1997).  This is so even if the employee relied on what he was told by an unemployment office employee, expended the benefits in reliance on the initial determination, and would face difficulty repaying the benefits.  Id. at 674-76.

Moreover, a claimant is liable to refund the entire amount of benefits received even if he would have been entitled to receive partial unemployment benefits had he reported his earnings accurately.  See Malady, 159 N.J. Super. at 532.  If an individual received benefits that were not rightfully due as a result of false statements or representations, the individual must be disqualified from receiving benefits "[f]or a period of one year from the date of the discovery . . .

of the illegal receipt or attempted receipt of benefits," N.J.S.A. 43:21-5(g)(1), and is held "liable to a fine of [twenty-five percent] of the amount fraudulently obtained," N.J.S.A. 43:21-16(a)(1), in addition to the requirement to repay the benefits fraudulently received, N.J.S.A. 43:21-16(d).

Here, we discern no basis to disturb the Board's decisions. Because Byrne's receipt of benefits was based on his admitted failure to report any earnings for designated weeks in 2010, and the underreporting of earnings for designated weeks since 2011, despite being paid by Monmouth, the Board properly determined he was obligated to repay the funds received, subject to a fine, and disqualified from applying for benefits for one year. The Tribunal considered and rejected Byrne's explanation for not reporting his correct earnings and the Board affirmed that determination. Thus, the agency's finding that he "knowingly misrepresented himself as unemployed" to receive benefits, and underreported "well below what he actually earned" once he began reporting, was supported by substantial, credible evidence in the record and was neither arbitrary, capricious, nor unreasonable.

Moreover, Byrne's argument that he was eligible to receive partial unemployment benefits is unpersuasive. Under the regulations, a claimant may be eligible for unemployment benefits for a week of partial unemployment if,

due to "'a lack of work,'" the number of hours worked in a calendar week does not exceed "[eighty] percent of the hours worked according to the norm or custom associated with the individual's occupation, profession, trade, or industry[,]" N.J.A.C. 12:17-6.2(b), and the claimant "earns remuneration which does not exceed the weekly benefit rate plus [twenty] percent of such rate." N.J.A.C. 12:17-2.1.  See also N.J.S.A. 43:21-3(b).  An individual claiming partial unemployment benefits must "file a bi-weekly benefit claim . . . and shall provide for each week, the gross remuneration amount, number of hours worked, and, if so instructed, the employer's name, address, and telephone number." N.J.A.C. 12:17-6.3(a).

Here, there is no evidence in the record that Byrne worked less hours than that of a comparable part-time college instructor nor that his hours were reduced as a result of a "lack of work."  Moreover, the payroll records show that Byrne's earnings often exceeded the allowable partial benefit rate.[5]  Thus, because his weekly "gross remuneration" exceeded his weekly benefit rate by more than twenty percent, Byrne was not entitled to partial unemployment benefits for a number of weeks.  Even if Byrne was eligible to receive partial unemployment

---

[5]  For example, for the weeks ending January 23 and 30, 2010, Byrne earned $961 in wages, in excess of his $720 partial benefit rate.

benefits for the remaining claimed weeks, he continuously underreported his earnings and failed to comply with the reporting requirements under N.J.A.C. 12:17-6.3(a).

We further reject Byrne's contention that the demand for a refund of $33,288 in connection with his first claim is barred under the doctrine of res judicata because it was previously adjudicated in 2011. Res judicata refers "broadly to the common-law doctrine barring relitigation of claims or issues that have already been adjudicated." Velasquez v. Franz, 123 N.J. 498, 505 (1991). The application of res judicata "'requires substantially similar or identical causes of action and issues, parties, and relief sought,' as well as a final judgment." Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 606 (2015) (quoting Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460 (1989)).

Here, the record reveals that the 2011 hearing Byrne refers to was a "telephone fact-finding interview" conducted to determine whether Byrne was eligible for benefits, not whether he fraudulently obtained unemployment compensation benefits. Furthermore, there is no evidence in the record that a final administrative agency decision was made after the fact-finding interview, or that there was a prior determination that a refund was due. According to Byrne's own testimony, his claim "was deemed not extendable." Therefore,

17

because the 2011 fact-finding interview did not result in a final agency decision, Byrne's res judicata argument fails.

To the extent we have not specifically addressed any of Byrne's remaining arguments, we deem them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5518-16T3